NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ELIZABETH DOLES,**
*Petitioner-Appellant*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellee*

---

2023-2404

---

Appeal from the United States Court of Federal Claims in No. 1:17-vv-00642-SSS, Judge Stephen S. Schwartz.

---

Decided: April 23, 2025

---

JENNIFER ANNE MAGLIO, Maglio Christopher & Toale, PA, Sarasota, FL, argued for petitioner-appellant. Also represented by ANNE TOALE.

CATHERINE STOLAR, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by BRIAN M. BOYNTON, C. SALVATORE D'ALESSIO, HEATHER LYNN PEARLMAN, DARRYL R. WISHARD.

---

Before DYK, CLEVENGER, and PROST, *Circuit Judges*.

CLEVENGER, *Circuit Judge*.

Ms. Elizabeth Doles appeals from the final decision of the United States Court of Federal Claims ("Claims Court") which dismissed her petition for compensation under the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10–34 ("Vaccine Act"). *Doles v. Dep't of Health & Hum. Servs.*, 167 Fed. Cl. 525 (2023) (*Doles III*). We have jurisdiction over her timely appeal under 28 U.S.C. § 1295(a)(3) and 42 U.S.C. §§ 300aa-12(f). For the reasons set forth below, we reverse the final decision of the Claims Court. Ms. Doles is entitled to compensation under the Vaccine Act. We remand for a determination of damages.

I

The Vaccine Act entitles persons to financial compensation for injuries either directly caused or significantly aggravated by statutorily recognized vaccines. *Id.* at §§ 300aa-10–34. Under the statute, significant aggravation means "any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." *Id.* at § 300aa-33(4). Under the Vaccine Act, a petitioner can establish causation in one of two ways. The first is by establishing an unrebutted presumption of causation through a showing that petitioner satisfies the conditions listed for a "table injury." *See id.* at § 300aa-14.

The second way a petitioner can recover, where the administered vaccine is listed in the Vaccine Injury Table but their injury is not similarly listed, known as an "off-table injury," is to prove causation-in-fact by preponderant evidence. *Id.* at §§ 300aa-11(c)(1)(C)(ii), 13(a)(1). The Vaccine Act is overseen by the Secretary of Health and Human Services ("HHS").

Ms. Doles seeks off-table compensation for the significant aggravation of her preexisting multiple sclerosis ("MS") caused by the polio and Tdap (tetanus, diphtheria, and acellular pertussis) vaccines she received. Where significant aggravation is alleged for off-table injuries, the petitioner must satisfy the six-factor test established in *Loving ex rel. Loving v. Secretary of Department of Health & Human Services*, 86 Fed. Cl. 135 (2009), adopted by this court in *W.C. v. Secretary of Health & Human Services*, 704 F.3d 1352, 1357 (Fed. Cir. 2013). Under *Loving*, petitioner must prove each element of the following six-factor test by a preponderance of the evidence:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving*, 86 Fed. Cl. at 144. To satisfy the fourth *Loving* factor, a petitioner is "required to present a medically plausible theory demonstrating that a vaccine 'can' cause a significant worsening" of a preexisting condition. *Sharpe v. Sec'y of Health & Hum. Servs.*, 964 F.3d 1072, 1083 (Fed. Cir. 2020) (citing *Pafford ex rel. Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1356-57 (Fed. Cir. 2006.))

A petition seeking compensation under the Vaccine Act is assigned to a Special Master ("SM") in the Office of

Special Masters in the Claims Court. "Congress assigned to a group of specialists, the Special Masters within the [Claims Court], the unenviable job of sorting through these painful cases, and based upon their accumulated expertise in the field, judging the merits of the individual claims." *Hodges v. Sec'y of Dep't of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993). Whether an SM rules for or against a petitioner, the standard of review by the Claims Court is highly deferential to the decision of the SM. The Claims Court must accept findings by an SM unless the court concludes that the findings are arbitrary or capricious. 42 U.S.C. § 300aa-12(e)(2)(B); *Lampe ex rel. Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000). On review of a decision by the Claims Court reviewing an SM decision, we apply the same arbitrary and capricious standard. *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011).

It is not the role of either the Claims Court or this court to "second guess the Special Master's fact-intensive conclusions[,] particularly in cases in which the medical evidence of causation is in dispute." *Id.* at 1249 (cleaned up). Nor does a reviewing court "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence." *Milik v. Sec'y of Health & Hum. Servs.*, 822 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Porter*, 663 F.3d at 1249). Deference to findings by a Special Master is required because "[i]t is, after all, the special masters to whom Congress has accorded the status of expert, entitling them to the special statutory deference in fact-finding normally reserved for specialized agencies." *Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 871 (Fed. Cir. 1992). Special Masters are entitled to credit circumstantial evidence, which may suffice under the preponderance standard; and under the Vaccine Act "close calls regarding causation are resolved in favor of injured claimants." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005)

(citing *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)). Evidence showing that a vaccine is capable of impacting the brain in the manner proposed by a causation theory provides support for the theory. *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1362 (Fed. Cir. 2019). "[R]eversible error is extremely difficult to demonstrate if the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d. 1378, 1381 (Fed. Cir. 2021) (alteration in original) (quoting *Lampe*, 219 F.3d at 1360).

As this court has recognized, the assessment of the merits of a proffered medical theory of causation to satisfy *Loving*'s fourth factor may involve assessment of evidence of medical literature. *Andreu ex rel. Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1380 (Fed. Cir. 2009). But the assessment is made through the standards of the Vaccine Act's preponderance evidence test, not through the standards of rigorous medical research, in which "attribution of causation is typically not made until a level of *very near certainty*—perhaps 95% probability—is achieved." *Id.* (emphasis in original) (citation omitted). Therefore, "[m]edical literature . . . must be viewed . . . not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* So, a proffered medical theory of causation is measured by preponderance of evidence, not by whether the theory satisfies the standards of medical research. *Id.* A medical theory for causation of an aggravated injury thus must be "legally probable, not medically or scientifically certain." *Knudsen*, 35 F.3d at 548-49.

## II

At 67 years of age Ms. Doles respectively received polio and Tdap vaccinations on April 4th and 22nd of 2016, in preparation for a Peace Corps mission. Shortly thereafter,

Ms. Doles began to experience numbness and hot spots on her left leg.  On June 5, 2016, approximately 44 days after receiving her Tdap vaccine, Ms. Doles went to the emergency room seeking treatment for extreme right side pain, weakness, and numbness.  She informed her doctors that these symptoms began two days earlier.  Radiographic imaging revealed white matter lesions in Ms. Doles' brain and enhancing spinal lesions on the right side of her C3 and C4 vertebrae.  A spinal tap revealed the presence of oligoclonal bands.

Thirteen days later, after undergoing further observation, imaging, and treatment, Ms. Doles was transferred from the hospital to a rehabilitation facility where she spent 10 days undergoing physical and occupational therapy.  At that time, Ms. Doles' treating physicians proposed several diagnoses based on her computed tomography (CT) and magnetic resonance imaging (MRI) scans: MS, transverse myelitis ("TM"), acute disseminated encephalomyelitis ("ADEM"), or unspecified acute central nervous system demyelinating disease.  Until then, Ms. Doles had no significant medical history except for diagnoses of Graves' Disease and degenerative lumbar osteoarthritis.

Ms. Doles continued to experience significant pain and sensory symptoms through the remainder of 2016 and consistently attended follow-up appointments to monitor and treat her condition.  Ms. Doles continued to suffer such significant symptoms through 2019.

On May 16, 2017, approximately 13 months after receiving her vaccinations, Ms. Doles petitioned for compensation under the Vaccine Act.  In July of 2019, Ms. Doles amended her petition to allege that her vaccinations

"actually caused, or, alternatively, significantly aggravated" her MS.  J.A. 1938-39 ¶ 10.[1]

### III

Ms. Doles' petition for relief was originally assigned to SM Millman, and was reassigned to SM Horner on June 6, 2019, upon SM Millman's retirement.

Ms. Doles' designated medical expert, Dr. John Steel, submitted his report to SM Millman, in which he opined that Ms. Doles' injury resulted from administration of the two April 2016 vaccines.  Dr. Steel presented a *Loving* medical theory of causation on Ms. Doles' behalf.  He explained that "MS . . . [is] a disorder of immune regulation, [a demyelinating disease,] in which the immune system is overly active and erroneously targets normal body tissue [in the central nervous system ("CNS")]."  J.A. 1694.  Though the exact cause of MS is unknown, recent medical studies emphasize the presence of an imbalance between T-cells and dendritic cells, causing a distinct shift towards an undesirable pro-inflammatory state in the CNS.  J.A. 1694.  Dr. Steel opined that it was "[v]ery likely[] the immune stimulation from multiple vaccinations altered [Ms. Doles'] biological equilibrium," triggering an immune system insult resulting in her first overt symptoms of MS.  J.A. 2230.

Dr. Steel theorized that vaccinations, which introduce antigens into the body, may serve to trigger an autoimmune response in the CNS in individuals with underlying susceptibility through some form of T-cell excitation, similar to the response observed with other immune system stressors (e.g., infections, insect bites).  This T-cell response can take several forms, including T-helper cell activation, molecular mimicry, and bystander activation.  Any of these T-cell responses could be involved, Dr. Steel posited, but

---

[1] Paginated references to the J.A. refer to the parties' Corrected Joint Appendix.

molecular mimicry especially is often recognized by the medical community as a "process by which vaccination could induce autoimmunity." J.A. 1695. Molecular mimicry, he explained, suggests that antibodies form in response to the administered vaccine and proceed to attack myelin with chemical and structural similarities to the vaccine's antigens. As support for his medical theory of causation (T-cell excitation via molecular mimicry), Dr. Steel cited a nested case-controlled study performed by Dr. Annette Langer-Gould and her co-authors.

The purpose of the Langer-Gould study was to conduct a detailed examination of the association between the first onset of demyelinating conditions and vaccinations, with a particular focus on the clinically observed phenomenon of symptom onset shortly following vaccination. Langer-Gould looked at vaccinated patients of all ages within the Kaiser Permanente Southern California database and identified 780 cases involving patients experiencing symptom onset of any demyelinating condition within three years of any vaccination. The study looked at all vaccinations, including the types received by Ms. Doles (polio and Tdap), with Tdap being one of the most commonly reported vaccines received by adults in the study. The authors of the study used conditional logistic regression to estimate the matched odds ratio ("OR"—the relative risk of symptom onset over the control case) and a corresponding 95% confidence interval ("CI"—the range of values that the estimated odds ratio will fall within, 95 out of 100 times) to determine the presence of statistically significant, i.e., medically certain, associations between demyelinating conditions and vaccinations. The authors chose to bifurcate the study's identified 780 cases by age—patients under 50 and patients 50 and older—because of the rare occurrence of new onset MS in people over 50.

Data for all 780 cases, which encompassed all vaccines, was then charted with the bifurcation at 50 years of age. Based on the case data within these two distinct age

populations, the authors made several findings. First, Langer-Gould identified a medically certain (statistically significant) increased risk of symptom onset for any CNS ADS[2] within the first 30 days of vaccination in patients under 50 years of age. This specific statistically significant risk of symptom onset was based on an OR of 2.32 for 14 cases presenting within 14 days after vaccination, and an OR of 1.57 for 10 additional cases presenting within 15 to 30 days after vaccination. Second, Langer-Gould identified a definitive trend towards increased risk of symptom onset specifically for MS, though not to a degree of medical certainty, within the first 30 days of vaccination in patients under 50 years of age.

For patients 50 years of age and older, Langer-Gould was unable to make any medically certain conclusions or identify any definitive trends between demyelinating conditions and vaccination at any time post-vaccine exposure. But, for that age group, the study examined the records of patients who experienced both CNS ADS and specific MS symptoms following vaccination. For CNS ADS, the study identified 22 cases within 90 days following vaccination. For MS specifically, the study reported 8 cases within 90 days after vaccination. One such case presented between 30 and 42 days. Additionally, by extrapolating from the study's findings, Langer-Gould was able to make certain conclusions relevant to vaccinated persons generally. Langer-Gould found that the short-term presence of increased risk works against a finding of outright causality, but is strong evidence in support of "vaccines acting as a

---

[2] "CNS ADS" refers to central nervous system acute demyelinating syndrome. CNS ADS encompasses a range of conditions affecting the brain's white matter, such as MS, TM, and ADEM. J.A. 1693. Langer-Gould found that the most common form of incident CNS ADS among the 780 cases was MS, occurring in 427 patients. J.A. 2303.

proinflammatory cofactor in individuals with subclinical autoimmunity because [T-cell excitation] would be expected to hasten symptom onset but not change the long-term risk of developing MS." J.A. 2307. Relatedly, the authors concluded that vaccines, triggering the same biological mechanisms as infections such as T-cell excitation, may serve to advance a patient's subclinical autoimmunity from dormant or silent to overt.

HHS's medical expert, Dr. Subramaniam Sriram, did not challenge Dr. Steel's basic molecular mimicry theory as the reason for Ms. Doles' injury, but challenged Dr. Steel's reliance on Langer-Gould because the study found no statistical association between vaccines and CNS ADS in patients over 50 at any time interval. Dr. Sriram further noted that in younger individuals, there was no increased risk of CNS ADS 30 days after vaccination, and that Ms. Doles' symptoms began after the 30-day risk period identified in the study. Dr. Sriram opined that the study "simply does not bolster Dr. Steel's claim that Ms. Doles was more likely to develop any CNS ADS." J.A. 3268.

## IV

SM Horner issued his ruling on entitlement on February 1, 2021, which analyzed Ms. Doles' case under each of the *Loving* factors, finding each in favor of Ms. Doles. *Doles v. Sec'y of Health & Hum. Servs.*, No. 17-642V, 2021 WL 750416 (Fed. Cl. Feb. 1, 2021).

Regarding the first and second factors (patient's before and after vaccination conditions), both medical experts read Ms. Doles' post-vaccination MRI study to indicate that Ms. Doles had pre-existing, subclinical, silent MS prior to her April 2016 vaccinations and agreed that Ms. Doles experienced an attack of CNS ADS less than two months following her vaccinations.

On the third factor, whether Ms. Doles' post-vaccination condition constituted significant aggravation of her

pre-vaccination condition, the experts disagreed on the nature of Ms. Doles' initial post-vaccination episode. Dr. Steel viewed that episode as an isolated attack of TM, meaning that the vaccines caused Ms. Doles' TM. Dr. Sriram disagreed, and viewed Ms. Doles' post-vaccination event as a progression of her underlying MS. As between the experts, SM Horner opined that the complete medical record favored Dr. Sriram's interpretation, concluding that "it is more likely than not that petitioner's post-vaccination symptoms were a part of the overall clinical course of her pre-existing MS rather than a separate attack of TM." J.A. 141. SM Horner found Ms. Doles' post-vaccination condition to constitute significant aggravation of her underlying MS.

On *Loving*'s fourth factor, SM Horner stated that the medical theory of causation "must only be 'legally probable, not medically or scientifically certain,'" *id*. (citing *Knudsen,* 35 F.3d at 548-49), and that the evidence before him must be viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderance evidence standard," *id*. (citing *Andreu,* 569 F.3d at 1380).

Regarding Dr. Steel's molecular mimicry causation theory, SM Horner credited Dr. Sriram's explanation that the prevailing opinion within the medical community is that MS is mediated by T lymphocytes that create an ongoing inflammatory response in the CNS. This response results in the development of lesions in the white matter and in particular the myelin membranes of the CNS, and this demyelination causes clinical disability such as weakness in the arms and legs. SM Horner then credited Dr. Steel's opinion that vaccines can create a heightened immune response, and in turn, the "antibodies formed in response to the vaccine may attack myelin related epitopes if these epitopes are likely [*sic*] the antigens in their chemical and physical structure." J.A. 142.

In the context of these medical opinions, SM Horner cited and found Langer-Gould an "especially relevant and persuasive study related to significant aggravation of MS." J.A. 142. In terms of statistically significant evidence, SM Horner acknowledged that Langer-Gould made only one such finding: the risk of onset of CNS ADS within 30 days of vaccination among individuals under 50 years of age, a finding that clearly did not apply to Ms. Doles. Nonetheless, SM Horner explained that the T-cell response of molecular mimicry, recognized by both experts, was the same mechanism used to support the Langer-Gould conclusion that the study's "findings are consistent with vaccines acting as a proinflammatory cofactor in individuals with subclinical autoimmunity because this mechanism would be expected to hasten symptom onset but not change the long term risk of developing MS or CIS[3]." J.A. 142. SM Horner further found that the statistically significant risk of onset of CNS ADS, even if limited to age and time from vaccination to onset, is nonetheless circumstantial evidence that vaccines are a relevant antecedent event in causation of onset. SM Horner noted that Langer-Gould, which reported numerous individual but statistically insignificant cases of post-vaccination CNS ADS and MS within 90 days of vaccination in the over-50 age group, was constrained from elevating those individual findings to statistical significance due to the study's small number of older participants. SM Horner further observed that Langer-Gould did not generally purport to set an outside limit of 30 days for the expected reactions to occur. Overall, SM Horner found Dr. Sriram's rejection of Langer-Gould, because its statistical

---

[3] "CIS" refers to clinically isolated syndrome, a mono- or multifocal inflammatory demyelinating one-time event in the CNS. If a CIS patient is subsequently diagnosed with MS, the CIS is considered the patient's first attack of MS.

risk prediction finding did not fit Ms. Doles' case, unpersuasive.

On *Loving*'s fifth factor (logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation), SM Horner noted that both experts agreed that Ms. Doles' MS was silent before her vaccinations and that she suffered a clinical attack of her MS following her vaccinations. Coupled with the validated medical theory of causation presented by Ms. Doles, SM Horner found this factor satisfied.

Finally, as to the sixth factor (proximate temporal relationship between vaccination and injury), Ms. Doles' post-vaccination symptoms occurred less than two months following her vaccinations. SM Horner cited medical literature showing such symptoms arising within three to four weeks of vaccination, as well as up to six months after vaccination, thus satisfying the sixth factor.

After finding that Ms. Doles satisfied each of the *Loving* factors, SM Horner concluded that preponderant evidence showed that Ms. Doles' MS was significantly aggravated by the vaccines she received, entitling her to compensation under the Vaccine Act.

V

On November 4, 2021, HHS filed a motion with the Claims Court seeking review of SM Horner's February 1, 2021 decision. HHS did not challenge Dr. Steel's medical theory of causation, molecular mimicry, under *Loving*'s fourth factor. Instead, HHS challenged SM Horner's reliance on Langer-Gould as support for the theory as arbitrary and capricious because Ms. Doles "does not fall within the group of study participants who were at an increased risk of developing CNS ADS, and the Special Master's determination that the Langer-Gould study nevertheless advances [Ms. Doles'] 'theory' is thus facially implausible." J.A 3412-13. HHS also challenged SM Horner's decision

on *Loving*'s fifth and sixth factors, primarily on the ground that without adequate support of the medical theory to satisfy the fourth factor, the additional factors cannot be satisfied.

HHS also argued that the process by which SM Horner reached his decision deprived HHS of its due process rights by analyzing Ms. Doles claim as one of significant aggravation under *Loving*. HHS referred to some evidence presented for Ms. Doles, suggesting that her claim was one of direct causation of her injury rather than aggravation of a pre-existing injury, and argued that HHS had expected SM Horner's decision to turn on causation-in-fact. HHS contended that it had been deprived of its right to respond fully to the claim of significant aggravation.

On April 26, 2022, the Claims Court issued its decision on HHS's motion for review. *Doles v. Sec'y of Health & Hum. Servs.*, 159 Fed. Cl. 241 (2022) (*Doles I*). The Claims Court held that SM Horner's decision was arbitrary and capricious for two reasons. First, the Claims Court agreed with HHS that SM Horner's treatment of the case as one of significant aggravation was unexpected, and thus had deprived HHS of the opportunity to respond to the case on the decided ground. Second, the Claims Court, invoking the arbitrary and capricious standard of review, held that SM Horner erred in treating the Langer-Gould study as supporting evidence for Ms. Doles' *Loving* fourth factor medical theory of causation.

The Claims Court stated that Langer-Gould found no association between MS and vaccinations, and that "[t]he only association found in the study involved demyelinating conditions generally, *i.e.*, conditions *other* than the demyelinating condition [Ms. Doles] has." *Id.* at 247. Regarding Langer-Gould's risk of onset of CNS ADS symptoms finding, the Claims Court determined that a statistically significant risk factor could not be based on a confidence

interval that straddles an OR of 1.0.[4] *Id.* Langer-Gould's statistically significant finding relied on 24 cases: 14 cases presenting within 14 days post-vaccination, OR: 2.32; CI: (1.18-4.57), and 10 cases presenting between 15 and 30 days post-vaccination, OR: 1.57; CI: (0.96-2.58). However, the Claims Court concluded that the study's only statistically significant finding must be based solely on the first 14 cases, in patients under 50 years of age presenting symptoms within 14 days after vaccination, whose OR was 2.32 and whose confidence interval was (1.18-4.57), which does not straddle but instead is entirely above 1.0.

Because Ms. Doles' age and the time between her vaccinations and the onset of her MS symptoms fell outside of the statistically significant cases, the Claims Court held that she could not benefit from the Langer-Gould study. The Claims Court dismissed the non-statistically significant observations and findings in Langer-Gould as hypotheses and not evidence, including the study's observation that vaccines can act as a proinflammatory cofactor in individuals with subclinical autoimmunity because T-cell excitation would be expected to hasten symptom onset.

The Claims Court made clear that it measured the relevance of the Langer-Gould study to Ms. Doles' case by the standards of medical certainty, stating that the "study's findings must be interpreted using correct statistical methods." *Id.* at 249. It then applied such rigorous standards to its own analysis of Langer-Gould's one statistically significant finding. In sum, the Claims Court held arbitrary

---

[4] To "straddle" an OR of 1.0, the confidence interval must cover a range of potential odds ratio values both above and below 1.0, *e.g.*, (0.72-3.3). A confidence interval that does not straddle 1.0 is entirely above 1.0, *e.g.*, (1.42-3.78).

and capricious SM Horner's reliance on Langer-Gould's non-statistically significant findings.

The Claims Court granted HHS's motion for review, vacated SM Horner's decision, and remanded the case for further proceedings.

On remand, SM Horner understood the Claims Court to have barred him from any reliance on the Langer-Gould study. **A83.** Even so, SM Horner found that the medical evidence in the case proved Ms. Doles' case by a preponderance. HHS again appealed. The Claims Court found that SM Horner's decision arbitrarily changed his interpretation of Dr. Steel's opinions, warranting SM Horner's removal from the case and further consideration of the case by "fresh eyes" of another SM. *Doles v. Sec'y of Health & Hum. Servs.*, 163 Fed. Cl. 726, 733 (2023) (*Doles II*).

On remand, the new SM, SM Oler understood the Claims Court to have barred any reliance on the Langer-Gould study, and as such SM Oler concluded that Ms. Doles failed to satisfy the fourth factor of *Loving*. *Doles v. Sec'y of Health & Hum. Servs.*, No. 17-642V, 2023 WL 2750041, at *24 n.14 (Fed. Cl. Mar. 15, 2023). If free to consider the Langer-Gould study, SM Oler alternatively opined that Ms. Doles satisfied the fourth factor of *Loving*. Absent satisfaction of *Loving*'s fourth factor, SM Oler opined that Ms. Doles also does not satisfy *Loving*'s fifth factor. Accordingly, SM Oler dismissed Ms. Doles' petition for compensation. Ms. Doles appealed to the Claims Court. The Claims Court noted that it had not ordered SM Oler to reject the Langer-Gould study entirely, but that SM Oler's alternative reliance on the Langer-Gould study, in the earlier manner of SM Horner, was misplaced. Because Ms. Doles had not shown SM Oler's decision to be arbitrary or capricious, the Claims Court held that Ms. Doles' case failed for want of a sufficient medical theory in satisfaction of the fourth factor of *Loving*. *Doles III*, 167 Fed. Cl. at 532, 535.

Ms. Doles' appeal to this court faults each of the decisions of the Claims Court, but in particular she challenges the decision in *Doles I* that SM Horner was arbitrary and capricious in his reliance on the Langer-Gould study as support for Ms. Doles' medical theory of causation of her aggravated MS. HHS concedes that the due process fault by SM Horner in his first decision has been mooted by subsequent proceedings before the special masters, and thus is no longer a matter for consideration. *See* Oral Arg. at 6:49-7:42, 21:40-23:21, *Doles v. Sec'y of Health & Hum. Servs.*, No. 2023-2404 (Fed. Cir. Feb. 3, 2025), https://oralarguments.cafc.uscourts.gov/default.aspx?fl=2 3-2404_02032025.mp3 (hereinafter "Oral Arg."). The parties agree that if SM Horner was not arbitrary and capricious in his reliance on the Langer-Gould study in support of Ms. Doles' basic medical theory of causation, Ms. Doles has satisfied the *Loving* test and is entitled to compensation under the Vaccine Act. *See* Oral Arg. at 6:49-7:42, 18:54-22:00. We thus turn to the question of whether the Claims Court correctly held that SM Horner was arbitrary and capricious in his reliance on the Langer-Gould study as support for Ms. Doles' medical theory of causation.

## VI

Ms. Doles argues that the Claims Court initially erred by stating that the Langer-Gould study found no association between MS and vaccinations. The study's statistically significant finding that patients under 50 years of age experienced CNS ADS symptoms, which includes MS symptoms, within 30 days after vaccination, clearly shows an association between vaccines and MS.[5] Ms. Doles

---

[5] HHS acknowledges that the Claims Court may have erred in viewing Langer-Gould to show no association between vaccines and MS; however, HHS attributes the error to two points in the study that referred to MS and the

argues that the *Doles I* Court more fundamentally erred in rejecting any teaching from Langer-Gould beyond what the Claims Court considered the study's one statistically significant finding—that vaccines may cause CNS ADS symptoms within 14 days of vaccination in persons under the age of 50.  By thus limiting the relevance of Langer-Gould to Ms. Doles' theory of aggravation, Ms. Doles argues that the Claims Court in *Doles I* barred SM Horner's reliance on Langer-Gould's other teachings, such as that vaccines are redundant enhancers of preexisting autoimmunity, and that vaccine exposure may accelerate the transition from subclinical to overt autoimmunity in patients with existing disease, as well as the individual cases that led to the study's conclusion that its findings were consistent with vaccines acting as a proinflammatory cofactor in individuals with subclinical autoimmunity.  The study identified 22 cases in which patients 50-and-over experienced CNS ADS symptoms within 90 days after vaccination, and 8 cases with patients 50-and-over who experienced MS symptoms within 90 days after vaccination.  One such patient, like Ms. Doles, experienced MS symptoms between 30 and 42 days after vaccination.  In barring any reliance on Langer-Gould's non-statistically significant findings, Ms. Doles argues that the Claims Court drew the line at medical certainty and thus set too high a standard for relevant evidence under the Vaccine Act's preponderance standard.

HHS disagrees with Ms. Doles' argument, asserting in its brief and at oral argument that the Claims Court properly restricted the relevance of Langer-Gould to its medically certain findings which pertain only to persons

--------

broader CNS ADS category as disjunctive.  HHS considers the error harmless, because even crediting Langer-Gould's statistically significant finding, Ms. Doles' age and time of symptom onset remove her from the statistically significant finding, thus barring Ms. Doles' reliance on the study.

younger than Ms. Doles who experienced MS symptoms within 30 days after vaccination. HHS recognizes that Langer-Gould made non-statistically significant findings of patients experiencing MS symptoms following vaccination, and even included one patient whose age and time of onset read directly on Ms. Doles, but dismisses such evidence because it lacked statistical significance.

We agree with Ms. Doles' arguments. This court has expressly disavowed the requirement that petitioners under the Vaccine Act proffer a theory (under *Loving* factor four) that is grounded in medical certainty and backed by medically certain (statistically significant) evidence. *See Andreu*, 569 F.3d at 1380 ("In medical research, attribution of causation is typically not made until a level of *very near certainty*—perhaps 95% probability—is achieved. In contrast, determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is logical and legally probable, not medically or scientifically certain." (cleaned up)). For the Claims Court and HHS to fault Langer-Gould's relevance, and subsequently Ms. Doles' reliance on it as evidence of causation, solely for the study's lack of *statistically significant* conclusions regarding patients identically situated to Ms. Doles is incorrect. Langer-Gould contains circumstantial evidence which demonstrates that Ms. Doles' vaccines are capable of impacting the brain's white matter in the manner posited by Ms. Doles' underlying molecular mimicry theory of causation of her aggravated MS. By narrowing the evidentiary relevance of Langer-Gould, the Claims Court incorrectly deprived Ms. Doles of evidence that showed how her underlying causation theory can work. SM Horner was not arbitrary and capricious in his assessment of Langer-Gould and his conclusion that it provides support for Ms. Doles' theory of causation.

Throughout this case, from the presentation of expert opinions to SM Horner to oral argument before this court, there has been no question of the potential relevance of the

molecular mimicry theory to Ms. Doles' case. The question in the case has been whether Ms. Doles provided any evidence to support the plausibility of her theory by a preponderance of the evidence. HHS argued, and the Claims Court agreed, that SM Horner could not rely on non-statistically significant findings in the Langer-Gould study. This was incorrect. SM Horner's finding that the Langer-Gould study, the expert reports of Dr. Steel, and other evidence established causality for the significant aggravation of Ms. Doles' injury by a preponderance of the evidence was neither arbitrary nor capricious.

## CONCLUSION

For the reasons explained above, we reverse the Claims Court's ruling in *Doles I* and reinstate SM Horner's first decision. Ms. Doles is entitled to compensation under the Vaccine Act for the significant aggravation of her MS. We remand for a determination of damages.

## REVERSED AND REMANDED

### COSTS

No costs.